James D. Crosby (State Bar No. 110383)
Attorney at Law
13400 Sabre Springs Parkway, Suite 200
San Diego, California   92064
Telephone: (858) 486-0085
Facsimile:  (858) 486-2838
E-mail: crosby@crosbyattorney.com

Attorney for Plaintiffs PHILIP NEUMAN
and HILO AT CAMPBELL HALL ASSOCIATES, LLC,

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

| | |
|---|---|
| PHILIP NEUMAN, an individual; MESA TOP, LLC, a Nevada limited liability company; and PT NATIONAL ENTERPRISES, LLC, a Nevada limited liability company, and HILO AT CAMPBELL HAL ASSOCIATES, LLC, a Nevada limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> B2 BRANDS, INC., a Delaware corporation, JP BEVERAGES, LLC, a California limited liability company, JAIME BANFIELD, an individual, RICHARD MUNKVOLD, an individual,  CHRISTINA PREVITI, an individual, JAMES PREVITI, an individual, FRONTIER HOMES, LLC, a California limited liability company, and STEPHEN TROY VALDEZ, an individual, <br><br> Defendants. <br><br> AND RELATED CROSS-ACTIONS | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No.: EDCV07- 01025 CJC (JCRx) <br><br> MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT <br><br><br><br><br><br><br><br><br><br><br><br> Date: February 5, 2009 <br> Time: 9:00 a.m. <br> Dept.: <br> Magistrate Judge Goldman |

## TABLE OF CONTENTS

I.    INTRODUCTION...............................................................................1

II.   SUMMARY OF FACTS................................................................1

III.  APPLICABLE STANDARDS RE SUMMARY JUDGMENT.....................9

IV.   TRIABLE ISSUES REMAIN AS TO WHETHER THE
      CALIFORNIA UNIFORM TRADE SECRETS ACT PREEMPTS
      OTHER CAUSES OF ACTION.....................................................9

V.    TRIABLE ISSUES REMAIN AS TO WHETHER NEUMAN
      HOLDS AN OWNERSHIP INTEREST IN THE BEVERAGES AND
      INTELLECTUAL PROPERTY UNDER THE JOINT OWNERSHIP
      AGREEMENT...........................................................................11

      A.    Contrary to defendants' present position, Valdez repeatedly
            testified and declared in pleadings that he and Neuman
            jointly owned the malternative beverage intellectual
            property under the Joint Ownership Agreement.................................12

      B.    Valdez's rescission claims in the Valdez Action are
            inconsistent with defendants present position....................................16

      C.    Valdez's execution of the Joint Ownership Agreement
            establishes that B2 Brands held no rights to the
            malternative beverage intellectual property at the
            time of the Joint Ownership Agreement............................................18

      D.    Defendants' confused and contradictory positions on
            B2 Brand's alleged ownership of the beverages and
            the associated intellectual property raise triable issues.....................22

      E.    Defendants disingenuous use of the Memorandum of Decision
            in the Valdez Action.........................................................................25

      F.    The motion is largely supported by inadmissible evidence................26

i

G.     Triable issues remain as to whether B2 Brands owned
or held any rights to the malternative beverage
intellectual property at the time of the
Joint Ownership Agreement.............................................................26


VI.     TRIABLE ISSUES REMAIN AS TO WHETHER VALDEZ COULD
USE OR TRANSFER THE MALTERNATIVE BEVERAGE
INTELLECTUAL PROPERTY WITHOUT NEUMAN'S
CONSENT UNDER THE JOINT OWNERSHIP AGREEMENT...............29

VII.    CONCLUSION.............................................................................................30

## TABLE OF AUTHORITIES

### Statutes

FRCP 56.................................................................................................26

### Cases

Anderson v. Liberty Lobby, Inc. (1986) 477 US 242, 255......................................9

Eastman Kodak Co. v. Image Technical Services, Inc.
(1992) 504 US 451..............................................................................9

Callaway Gold Co. V. Dunlop Slazenger Group Americas, Inc
318 F.Supp. 2d 216,220......................................................................10

Digital Envoy, Inc. Google, Inc  (2005) 370 F,Supp2d 1025, 1035.....................10

Gospel Missions of America v. City of Los Angeles, 328 F.3d 548, 557
(9th Cir. 2003)......................................................................................15

K.C. Multimedia, Inc. V. Bank of America Technology & Operations, Inc
(2009) 171 Cal App 4th 939................................................................10

Parilla v. IAP Worldwide Serve. VI, Inc., 368 F.3d 269, 275 (3d Cir. 2004)........15
T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n
(9th Cir. 1987) 809 F2d 626, 630-631....................................................9

United States v. One Tintoretto Painting (2nd Cir. 1982) 691 F2d 603, 606..........9

<u>MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO</u>

<u>MOTION FOR SUMMARY JUDGMENT</u>

## I.

## INTRODUCTION

Defendants first challenge the First, Second, Third, Fourth, Fifth, Sixth and Second Seventh causes of action arguing they are preempted by the Sixth cause of action for misappropriation of trade secrets under the California Uniform Trade Secrets Act. This argument fails because defendants have not established the absence of triable issues of fact as to whether the challenged causes are based entirely on the misappropriation of "trade secrets"

Defendants next argue the Joint Ownership Agreement was <u>never</u> effective and thus Neuman holds no interest in the beverages and associated intellectual property. This assertion is expressly contradicted by numerous instances of prior Valdez testimony, a prior Valdez affidavit and prior pleadings from both Valdez and the moving defendants, by Valdez's rescission claims in the Valdez Action, and by Valdez's very execution of agreement. The motion on this issue is based largely on inadmissible documentary evidence and a disingenuous construction of this Court's decision in the Valdez Action.

Defendants last argue that absent an agreement imposing restrictions on the use of intellectual property, joint owners (in the case, Valdez) may use the jointly owned intellectual property independently of each other and without each other's knowledge, permission or assent. Yet, just such a restriction existed with the Joint Ownership Agreement. Both Neuman and Valdez understood and agreed that under the Joint Ownership Agreement, neither party could use or transfer away the beverages and associated intellectual property without the consent of the other.

## II.

## SUMMARY OF FACTS

In June, 2005, plaintiff Philip Neuman ("Neuman") and defendant Steven Troy

1

Valdez (hereinafter "Valdez") undertook to develop, manufacture, and distribute malt-based alcoholic beverages commonly referred to as "malternative beverages" or "hard creamers". Prior to the start of this relationship, Valdez had developed formulas, recipes, beverages, marketing materials, trademarks and other proprietary information and intellectual property pertaining to development, manufacture, and distribution of these malternative beverages. Neuman and Valdez were to use these formulas, recipes, beverages, marketing materials, trademarks and other proprietary information and intellectual property for the development, manufacture, and distribution of the malternative beverages. [Neuman Dec., Para. 2].

On June 15, 2005, Valdez and plaintiff Hilo at Campbell Hall Associates, LLC (hereinafter "Hilo"), a limited liability company managed by Neuman, entered into an "Operating Agreement" (hereinafter the "Mesa Top Agreement").The Mesa Top Agreement created plaintiff Mesa Top, LLC ("Mesa Top") for the purpose of marketing, manufacturing, and distributing the malternative beverages. Hilo and Valdez are each fifty percent members of Mesa Top. Defendant B2 Brands was not a party to the Mesa Top Operating Agreement and Valdez did not execute the agreement as an officer of, or on behalf of, B2 Brands. Under the agreement Valdez also agreed not to compete with Mesa Top for ten years.[Neuman Dec., Para. 3; Ex. 28][1].

As part of the Mesa Top Operating Agreement, Valdez agreed to transfer the malternative beverages and associated proprietary information and intellectual property to Mesa Top. Paragraph 9 of the Mesa Top Operating Agreement provides as follows:

> **Immediately upon execution of this Agreement Valdez shall cause all beverages developed by him individually of [sic] in a corporate capacity, B2 Brands, tademarks [sic] and all assets of B2 Brands LLC to be assigned to the Limited Liability Company.**

Valdez understood this provision to mean that he was to **"transfer over all of <u>my IP</u> to Mesa Top. "** [Ex.1,Valdez Dep, 24:6-25:Ex. 5, Valdez Dep 325:1-330:13].

---

[1]Exhibits ("Ex.") are attached to the Notice of Lodgment filed herewith. Declarations are referred to as "Dec.". Deposition transcripts are attached as exhibits to the Notice and referred to as "Depo." with page and line numbers..

2

Neuman and Valdez proceeded to jointly market, manufacture and distribute the malternative beverages. Neuman, and others acting on his behalf, contributed considerable time and effort to the business. They showed the products at the National Beer Wholesalers Convention in mid-September 2005 in Las Vegas. The convention was successful, resulting in distribution leads. Yet, as of September 2005, Valdez had not yet transferred the beverages and associated intellectual property to Mesa Top. So, Neuman and Valdez entered into additional agreements to clarify ownership of the beverages and associated intellectual property. [Neuman Dec., Para. 6].

On September 18, 2005, Neuman and Valdez entered into an "Agreement" (hereinafter the "Joint Ownership Agreement") concerning the beverages and associated intellectual property. Defendant B2 Brands was not a party to the Joint Ownership Agreement and Valdez did not execute the agreement as an officer of, or on behalf of, B2 Brands. [Neuman Dec. Para. 7; Ex. 29]

By way of the Joint Ownership Agreement, Neuman and Valdez agreed that <u>all</u> the formulas, recipes, beverages, marketing materials, trademarks and/or other proprietary information and intellectual property to be used in the development, manufacture, and distribution of the malternative beverages were to be owned jointly by Neuman and Valdez. The Joint Ownership Agreement [Ex. 29] provides as follows:

**All trademarks, formulas, recipes, copyrights, beverages, materials, any other proprietary information held in trust or escrow, any assignment interest in LLC's or Corporations to third parties, and any other agreements under the control of Steven Troy Valdez is now jointly owned by Phil Neuman and Steven Troy Valdez. This information and data will be held under the name of PT National Enterprises, LLC, a newly formed Nevada entity.**

Valdez read, understood and intended to bound by the Joint Ownership Agreement. [Ex.5, 340:1-25, 343:3-350:12 350:19-358:7; Ex. 1,79:12-185:25, 191:24-194:10, 220:24-221:22; Ex.3 81:29-83:21]. He viewed the Joint Ownership Agreement as being the fulfillment of his obligation under the Mesa Top Agreement to transfer the beverages and the associated intellectual property to the joint ownership of Neuman. [Ex.5, 340:1-25, 343:3-350:12 350:19-358:7; Ex. 1,79:12-185:25, 191:24-194:10,

3

220:24-221:22; Ex.3 81:29-83:21

At no time prior to execution of the Mesa Top Agreement or the Joint Ownership Agreement did Valdez represent to Neuman (1) that he had already transferred the beverages and the associated intellectual property to defendant B2 Brands Inc, (2) that he did not have full authority to transfer the beverages and the associated intellectual property to the joint ownership of Neuman, or (3) that any transfer of the beverages and the associated intellectual property was contingent upon the approval or consent of others including alleged members of the Board of Directors of B2 Brands or James Kerr. [Neuman Dec., Paras. 4,5,9,10]. Rather, Valdez told Neuman that he individually owned the beverages and the associated intellectual property. [Neuman Dec., Paras. 4,9; Defendants Ex A; 91:15-92:2; Ex. 13, 96:8-97:7, 150:12-151:8].

By way of the Joint Ownership Agreement, Neuman and Valdez jointly own all the formulas, recipes, beverages, marketing materials, trademarks and/or other proprietary information and intellectual property to be used in the development, manufacture, and distribution of the malternative beverages. [Neuman Dec. Paras 7-11; Ex. 13, 85:1-87:11; Ex.5, 340:1-25, 343:3-350:12 350:19-358:7; Ex. 1,79:12-185:25, 191:24-194:10, 220:24-221:22; Ex.3 81:29-83:21]. Further, Neuman and Valdez understood and agreed that under the Joint Ownership Agreement, neither of them could use or transfer away the beverages and the associated intellectual property without the consent of the other. [Neuman Dec., Para. Ex.8; Ex.5, 379:8-381:5, 318:22-382:4].

On September 20, 2005, plaintiff Neuman and Valdez entered into two additional operating agreements forming plaintiff PT National Enterprises, LLC and B2 Beverage Company, LLC for the purpose of marketing, manufacturing, and distributing the malternative beverages. [Neuman Dec., Paras.12, 13]

Neuman and Valdez worked jointly to market, manufacture and distribute the malternative beverages. Neuman, and others acting on his behalf, continued to contribute considerable time, effort and money to the malternative beverages project. Neuman ultimately contributed in excess of $200,000 to the business over less than six months.

4

As of mid-December, all was ready for an early January production run. Neuman intended to proceed with and fund that production run. [Neuman Dec. Para.14]

On December 15, 2005, Valdez wrote to Neuman making a variety of charges and seeking to "terminate" the agreements. [Neuman Dec. Para. 15; Ex. 30]. On December 19, 2005, Neuman wrote to Valdez responding to Valdez's charges. [Neuman Dec. Para. 16; Ex.31]. On December 23, 2005, Valdez again wrote to Neuman, offering to "mutually rescind" the various agreements. [Neuman Dec. Para. 17; Ex.32]. On January 5, 2006, counsel for Neuman/Hilo rejected the offer to rescind.  [Neuman Dec. Para. 18; Ex. 33]. In neither of his December 2005  these letters did Valdez assert, <u>as defendants do now</u>, that the various agreements, including the Joint Ownership Agreement, was never effective. To the contrary, Valdez confirmed the agreements and sought to terminate or rescind them.

Valdez walked away from the business. Neuman was angry. Despite the fact he needed Valdez's consent to do so, Neuman considered proceeding with production of the beverages without Valdez. He did not, upon advice of counsel. [Neuman Declaration, Para. 19; Ex 13, 130:3-132:21].

On May 8, 2006, Valdez filed a civil action (<u>Valdez v. Neuman et., al.</u>; United States District Court Case No. SACV06-448 CJC MLGx - hereinafter the "Valdez Action") in this court against Neuman and Hilo seeking rescission of the various agreements, including the Joint Ownership Agreement, for fraud and negligent misrepresentation. [Neuman Dec. Para. 20; Crosby Dec., Para. 19; Ex. 17]. Valdez specifically alleged the execution and existence of the various agreements, including the Joint Ownership Agreement. Valdez alleged that the Joint Ownership Agreement provides for "joint ownership by Valdez and Neuman" of the beverages and the associated intellectual property. Valdez did not assert in the Valdez Action, <u>as defendants do now</u>, that the Joint Ownership Agreement was subject to unperformed contingencies and never effective. Rather, Valdez alleged the existence of that agreement and alleged grounds to rescind it.

1   Neuman learned in discovery in the Valdez Action that Valdez's actions had been
2   prompted by undisclosed potential investor.  In late November or early December, and
3   without Neuman's knowledge or consent, Valdez met with a prospective investor who
4   prompted him to rescind his agreements with Neuman. The investor's lawyer reviewed
5   Valdez's December 15, 2005 letter before it was sent to Neuman. Valdez's discussions
6   with the investor were a factor that prompted Valdez to file the Valdez Action.[Neuman,
7   Dec. Para. 24; Ex. 1, 212:13-213:24, 223:-234:24]

8   In May 2006, unbeknownst to Neuman, Valdez entered into a series of agreements
9   with John Previti and JP Beverages. Valdez claimed to transfer to JP Beverages the
10  formulas, recipes, beverages, marketing materials, trademarks and/or other proprietary
11  information and intellectual property used in the development, manufacture, and
12  distribution of the malternative beverages, the very same property transferred to
13  Neuman's joint interest under the September 2005 Joint Ownership Agreement. Valdez,
14  Previti, B2 Brands, and JP Beverages proceeded to manufacture and sell the beverages.
15  John Previti testified that at the time he was aware of the ongoing Valdez Action, that
16  he agreed to pay Valdez's attorney's fees in the Valdez Action, and that denial of
17  rescission of the Neuman/Valdez agreements was a significant risk  in the May 22
18  agreements.[2] [Neuman Dec. Para. 25; Ex. 1. 5:5-10:6, 146:3-149:18,152:12-153:16; Ex
19  6, 6:15-9:15, 12:8-13:5, 50:3-15, 57:17-60:12, 62:11-64:15]

20  Neuman did not learn of the May agreements until April 2007 when they were
21  disclosed in discovery in the Valdez Action.

22  In July, 2006, Neuman learned of the efforts by Valdez to sell the beverages and
23  filed suit in Pennsylvania. Neuman did not then know of the May 22, 2006 agreements,
24  Previti or JP Beverages. [Neuman Dec. para. 21]. In his declaration in the Pennsylvania
25  action, and in his deposition testimony about that affidavit, Valdez confirmed again that

26

27  [2]In essence, defendants **bet** on the outcome of the Valdez Action. They **bet** that Valdez would secure rescission
    of the Joint Ownership Agreement and divest Neuman of his ownership interest, and thereby provide after-the-fact
28  validation for the May 2006 agreements.

under, and effective the day of, the Joint Ownership Agreement, he and Neuman jointly owned the beverages and associated intellectual property. [Defendants Ex. 7, Para. 45; Ex. 13, 85:1-87:11; Ex.5, 340:1-25, 343:3-350:12 350:19-358:7; Ex. 1,79:12-185:25, 191:24-194:10, 220:24-221:22; Ex.3 81:29-83:21].Valdez's declaration made no mention of the May 2006 agreements, Previti or JP Beverages. The Pennsylvania Action was subsequently dismissed without prejudice in light of the pending Valdez Action.

In early August 2006, counsel for Valdez and B2 Brands sent a "cease and desist" letter to Neuman's counsel. [Neuman Dec., Para. 22, Crosby Dec, Para. 16, Ex. 15.]. Valdez's counsel did not assert, as defendants do now, that the Joint Ownership Agreement had never been effective or that the beverages and associated intellectual property were owned by B2 Brands. To the contrary, counsel stated that the "central issue" in the Valdez Action is the "validity" of the Neuman/Valdez agreements, and repeatedly stated the property "belonged" to Valdez and that Neuman was to "cease and desist any and all unauthorized use of Mr. Valdez's proprietary information, products and/or property". The letter made no mention of the May 2006 agreements, Previti or JP Beverages.

In October 2006, defendants Previti, Banfield and Munkvold became officers of B2 Brands. [Ex. (, 86:1-24, 90:11-25, Ex. 16]. They were then warned by outside counsel that the Valdez Action presented a risk.[Ex.9, 180:6-185:23, Ex 10].

On March 9, 2007, Valdez filed an amended complaint in the Valdez Action which added material failure of consideration as a basis for rescission. [Crosby Dec. Para 18, Ex. 17]. In the amended complaint, Valdez, again, specifically alleged the execution and existence of the various agreements, including the Joint Ownership Agreement. Valdez alleged that the Joint Ownership Agreement provides for "joint ownership by Valdez and Neuman" of the beverages and the associated intellectual property. In this amended pleading, Valdez again did not assert, as defendants now do, that the Joint Ownership Agreement was subject to unperformed contingencies and never effective. Rather, Valdez alleged the existence of that agreement and alleged grounds to rescind

1    it.

2    On August 15, 2007, Neuman commenced this action. (Neuman Dec. Para. 26]

3    On September 7, 2007, defendants filed a motion to dismiss this action. (Ex. F).

4    In the motion, defendants <u>again</u> confirmed that the Joint Ownership Agreement provided

5    for "joint ownership" by Neuman and Valdez of the beverages and the associated

6    intellectual property [Crosby, Dec. Para. 19, Ex. 19].

7    The Valdez Action was tried before Judge Carney in this Court in December

8    2007. Valdez proceeded to trial on his rescission claims <u>only</u>. [Defendant Ex. RR;

9    Neuman Dec. Para. 27]. On January 10, 2008, the Court issued a Notice of Decision

10   rejecting Valdez's rescission claims on all grounds.[Crosby Dec. Para 20, Ex 20].[3]

11   On January 16, 2008, Neuman's counsel wrote to counsel for defendants

12   demanding that cease and desist from many further production, distribution, sale and/or

13   shipment of beverages absent the express written approvals of my clients. [Crosby dec.

14   Para 21, Ex. 21]. In response, defendants' counsel did assert, <u>as defendants now do</u>, that

15   the Joint Ownership Agreement was never effective and therefore Neuman held no

16   interest in the beverages and associated intellectual property or that even if Neuman held

17   an interest, they did not  his consent. Rather, counsel stated Neuman's demand were

18   "premature". [Crosby Dec. Para. 22, Ex. 22]. Despite this demand and this Court's denial

19   of  rescission of the Joint Ownership Agreement, defendants continued to produce,

20   market and sell the malternative beverages. [Neuman Dec, Para. 29][4]

21   On March 17, 2008, the court in the Valdez Action issued a Memorandum of

22   Decision denying rescission on all grounds. [Defendant's Ex. RR].

23   On March 13, 2009, plaintiffs filed the Second Amended and Supplemental

24   Complaint bringing defendants Banfield, Munkvold, Previti, C. Previti and Frontier

25

26   [3]In other words, defendants lost their **bet** on the outcome of the Valdez Action. Defendants had **bet** that

27   Valdez would secure rescission in the Valdez Action and divest Neuman of his ownership interest, and thereby provide after-the-fact validation for the May 2006

28   [4]Defendants "doubled-down" on their initial litigation bet and continued to produce the products.

8

1  Homes into the action. On September 30, 2009, plaintiffs filed a Third Amended
2  Complaint. [Crosby Dec. Para. 23, Ex. 23]. On October 19, 2009, defendants filed
3  answers and counterclaims. [Crosby Dec. Paras. 24, 25, Exs. 24, 25]. Defendants now
4  move for summary judgment.

5                                      III.

6              APPLICABLE STANDARDS RE SUMMARY JUDGMENT

7         Summary judgment is a drastic remedy and is therefore to be granted cautiously.
8  Anderson v. Liberty Lobby, Inc. (1986) 477 US 242, 255. Rule 56 does not permit trial
9  by affidavits. The court's function on a motion for summary judgment is issue-finding,
10  not issue-resolution. United States v. One Tintoretto Painting (2nd Cir. 1982) 691 F2d
11  603, 606. The court must view the evidence presented on the motion in the light most
12  favorable to the opposing party. The evidence of the non-movant is to be believed, and
13  all justifiable inferences are to be drawn in his favor. The non-movant's version of any
14  disputed issue of fact is presumed correct Anderson v. Liberty Lobby, Inc., supra, 477
15  US at 255.. Eastman Kodak Co. v. Image Technical Services, Inc. (1992) 504 US 451;
16  T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n (9th Cir. 1987) 809 F2d 626,
17  630-631.

18                                      IV.

19     TRIABLE ISSUES REMAIN AS TO WHETHER THE CALIFORNIA UNIFORM
20         TRADE SECRETS ACT PREEMPTS OTHER CAUSES OF ACTION

21         Defendants challenge the First, Second, Third, Fourth, Fifth, Sixth and Second
22  Seventh causes of action arguing they are preempted by the Sixth cause of action for
23  misappropriation of secrets under the California Uniform Trade Secrets Act ("CUTSA").
24  California Civil Code Section 3426 et seq. This argument fails because the defendants
25  have not established the absence of triable issues of fact as to whether the challenged
26  caused are based solely on trade secret misappropriation. In fact, defendants have
27  affirmatively alleged in their pleadings that the subject beverages and intellectual
28  property only "may" constitute trade secrets.[Ex.; ]. Whether the beverages and

                                        9

1  intellectual property are is a factual issue in dispute, and defendants have not factually

2  established that any of the beverages and intellectual property at issue constitute "trade

3  secrets" or whether any of the challenged causes derive solely from trade secret

4  misappropriation

5      Whether a claim is based on trade secret misappropriation is factual question. <u>K.C.</u>

6  <u>Multimedia, Inc. V. Bank of America Technology & Operations, Inc</u>. (2009) 171 Cal

7  App4th 939; <u>Callaway Gold Co. V. Dunlop Slazenger Group Americas, Inc.</u> 318 F.Supp.

8  2d 216,220; <u>Digital Envoy, Inc. Google, Inc</u>  (2005) 370 F,Supp2d 1025, 1035.

9      Defendants have presented no evidence on the factual issue of whether the

10 challenged claims are based on trade secret misappropriation. Rather, defendants refer

11 to an allegation common to the challenged claims and then incorrectly characterize that

12 common allegation as being "**defendant stole trade secrets**". [Memo, pages 15-16]. But,

13 that is not what plaintiffs have alleged. Defendants have alleged that defendants

14 undertook to develop, produce and distribute the malternative beverages using not only

15 formulas and recipes, but also the beverages themselves, marketing materials, trademarks

16 and other proprietary information and intellectual property. Any or all of those items

17 may qualify as trade secrets under the CUTSA, any or all may not. This is a factual issue

18 for trial. Thus, the application of CUTSA preemption is dependent upon the factual

19 determination of what are and are not trade secrets in this case. Plaintiff holds the burden

20 on motion for summary judgment and has offered no evidence whatsoever on that issue.

21     In applying its ruling that the CUTSA preempts common law claims that are based

22 on that same nucleus of facts as the trade secret misappropriation claim, the <u>KC</u>

23 <u>Multimedia</u> court held that the challenged causes of action in that case were preempted

24 because "the complaint as a whole rests on factual allegations of trade secret

25 misappropriation" and "that each and every cause of action hinges on the factual

26 allegation that defendants misappropriated trade secrets". <u>Id.</u> at 959 The court also

27 referred to the <u>Callaway</u> case where the challenged claims were preempted because they

28 were "based entirely on the same allegations that formed the basis of its trade secret

1  claim". Similarly, the analysis here is whether, factually, the challenged causes of actions

2  derive from or are dependent upon the trade secret misappropriation. As a simple

3  example, as noted in the referenced common allegation plaintiffs allege that the

4  defendants improperly took the beverages themselves. Assume that the evidence is that

5  defendants took 10,000 cases of the beverage and sold them. The beverages are not trade

6  secrets in and of themselves. Any claim based upon the conversion of those beverages

7  would not be pre-empted. Clearly, whether there is preemption of any or all of the stated

8  causes of action is based upon further factual analysis.

9      To support their argument, defendants purposely use loose language. Citing <u>K.C.</u>

10  <u>Multimedia</u>, they argue that the CUTSA preempts any non-CUTSA claim that rests on

11  "allegations of the wrongful use of intellectual property". But, that is not what the case

12  says. The <u>K.C. Multimedia</u> analysis is tied to "trade secrets" and not to broader notions

13  of intellectual property that or may not qualify as trade secrets under the CUTSA. As

14  noted in the cited passage of Neuman testimony, Neuman claims that defendants took

15  "intellectual property" and "rights to manufacture and sell". Whether any of the taken

16  intellectual property constitutes trade secrets is an unresolved factual issue. The "rights

17  to manufacture and sell" are clearly not trade secrets. On summary judgment, plaintiff

18  must establish that any or all of the challenged causes of action derive, as a matter of

19  law, from trade secret misappropriation. They have not met that burden.

20  V.

21  TRIABLE ISSUES REMAIN AS TO WHETHER NEUMAN HOLDS AN

22  OWNERSHIP INTEREST IN THE BEVERAGES AND INTELLECTUAL

23  PROPERTY UNDER THE JOINT OWNERSHIP AGREEMENT

24      Defendants argue the September 18, 2005 Joint Ownership Agreement was

25  contingent upon (1) approval from the B2 Brands' board of directors and (2) consent

26  from Kerr under an alleged Loan and Pledge Agreement, and because Neuman never

27  obtained (1) and (2), the agreement was <u>never</u> effective and Neuman holds no interest

28  in the property.[Motion, 2:21-28; Memo., Pages 2-3, 9-10, 17-20]. This argument is

11

1    contrived and phony. It is expressly and directly contradicted by numerous instances of

2    prior Valdez testimony, a prior Valdez affidavit and prior pleadings from both Valdez

3    and the moving defendants, by Valdez's rescission claims in the Valdez Action, and by

4    Valdez's very execution of agreement. The motion is based largely on inadmissible

5    documentary evidence and proffers a disingenuous construction of this Court's decision

6    in the Valdez Action. For these and all the other reasons stated below, numerous triable

7    issues remain to be tried and the motion should be denied.

8          A.     Contrary to defendants' present position, Valdez repeatedly testified and

9                  declared in pleadings that he and Neuman jointly owned the malternative

10                 beverage intellectual property under the Joint Ownership Agreement.

11        Defendants claim that the Joint Ownership Agreement was never effective and,

12    accordingly, Neuman never held a joint interest in the beverages and the associated

13    intellectual property. This post-Valdez Action argument was reflected in the recent

14    testimony of defendant Valdez where he stated that the agreement did not transfer the

15    intellectual property associated with the malternative beverages to the joint Ownership

16    of you and Neuman. [Ex. 350:13-18, 35819-359:1]But, this argument is directly and

17    undisputedly contradicted by numerous instances of prior Valdez testimony, a prior

18    Valdez affidavit, and prior pleadings from both Valdez and defendants B2 Brands and

19    JP Beverages.

20        Valdez, an officer of B2 Brands since inception and its President and only officer

21    from 2003 through May 2006, repeatedly testified that he intended to be bound by the

22    Joint Ownership Agreement and that the Joint Ownership Agreement transferred the

23    beverages and the intellectual property associated with the malternative beverage

24    products to the joint ownership of Valdez and Neuman. [Ex. 13, 85:1-87:11; Ex.5, 340:1-

25    25, 343:3-350:12 350:19-358:7; Ex. 1,79:12-185:25, 191:24-194:10, 220:24-221:22;

26    Ex.3 81:29-83:21] For example, Valdez had set forth in his affidavit in the Pennsylvania

27    Action that the Joint Ownership Agreement "provided for joint ownership by me and

28    Neuman of various intellectual property rights and proprietary information". [Defendants

1  Ex. 7, Para 45.. Valdez was questioned about that affidavit at his May 16, 2007

2  deposition.

    Q:    Well, let me back up. Look at your declaration. It says, "One of the agreements, dated September 18, 2005, provided for joint ownership by me and Neuman of various intellectual property rights and proprietary information."

           Do you see that?

    A:    Right.

    Q:    And you're referring to the Exhibit 7 agreement; right?

    A:    Right.

    Q:    Now isn't it correct that in your affidavit filed in the Pennsylvania action you are stating and affirming that this agreement provides for joint ownership of the malternative beverage proprietary information by you and Neuman?

           Mr. Holley: Object as to form. Again, vague as to time.

           The Witness: I don't understand what you are trying to get at.

           Mr. Holley: Are you asking on that day that he signed it, is that what it did?

           Mr. Crosby: That's exactly what I'm saying.

           Mr. Holley; That's what he's saying.

           The Witness: Okay. Yes

    **Q:**    **On this day the malternative beverage intellectual property was transferred to you and Neuman jointly?**

    **A:**    **Yes.**

    **Q:**    **And that's the same intellectual property that you now transferred to JP Beverage, correct?**

    **A:**    **Yes.**

In his Memorandum of Contentions of Law and Fact filed for the purposes of trial in the

Valdez Action, Valdez addressed the September 18, 2005 Joint Ownership Agreement

as follows:

    Finally, the evidence will show that Valdez performed his obligations under the agreements. Defendants will argue that Valdez did not fulfill his obligations to assign joint ownership of his intellectual property rights to Neuman. However, the evidence will show that Valdez entered into a written agreement with Neuman on September 18, 2005. Under the

agreements, Defendants were responsible for handling the administrative end of the of the business. **Prior to September 18, 2005, they never prepared an assignment agreement for Valdez to execute. When Valdez was requested execute the assignment, he did so.**

[Ex. 27].

Valdez testified at <u>trial</u> in the Valdez action as follows:

> **Q:    So you viewed the September 18th transfer, Exhibit 7, as simply the fulfillment of your obligations under the Mesa Top Agreement to transfer the intellectual property?**
>
> **A:    And I did.**

[Ex. 3. 81:19-83:21].

This evidence directly contradicts defendants' moving argument. Defendants <u>now</u> argue and Valdez <u>now</u> testifies that the Joint Ownership Agreement was never effective and Neuman does not jointly hold the beverages and intellectual property. Yet, Valdez, an officer of B2 Brands since formation, its President and only officer from 2003 through May 2006,and the signatory to the Joint Ownership, has repeatedly testified and stated the agreement <u>was</u>, in fact, effective and Neuman <u>does</u> hold an interest in the beverages and intellectual property. At his recent deposition, Valdez, now represented by counsel for B2 Brands, readily acknowledged his prior testimony and statements on this ownership issue central to defendants argument and then proceeded to claim his repeated prior testimony and statements were wrong. [See Ex.    , Valdez December 21, 2009 Deposition, Page 340, line 2 through 359, line 1]. Clearly, such contradictory testimony by Valdez, the signatory the disputed agreement and the only defendant with any personal knowledge of the events of 2003-2005 raises basic triable issues of fact; i.e., which Valdez is to be believed - the Valdez seeking rescission in the Valdez Action <u>or</u> the Valdez who was denied rescission of the Joint Ownership Agreement and is now defending himself and the moving defendants under the joint representation of counsel for B2 Brands?

Further, numerous pleadings contradict defendants' present position that the Joint Ownership Agreement was never effective and Neuman holds no interest in the property.

14

1    In the complaint and amended complaint in the Valdez Action, Valdez specifically

2    alleged the execution and existence of the Joint Ownership Agreement and that it

3    provides for "joint ownership" by Valdez and Neuman of intellectual proprietary rights

4    and proprietary information.  In his Memorandum of Contentions of Law and Fact filed

5    in the Valdez Action [Ex. 27], Valdez stated that under the agreements Neuman acquired

6    "an ownership interest in the beverage line" and that the Joint Ownership Agreement was

7    the fulfillment of his obligation to transfer the beverages and the associated intellectual

8    property. In their motion to dismiss filed in this case in September 2007, defendants

9    reiterated that under the agreements, Neuman acquired "an ownership interest in the

10   beverage line" and that the Joint Ownership Agreement provides for joint ownership by

11   Valdez and Neuman of the intellectual proprietary rights and proprietary information.

12   These judicial admissions are conclusively binding on defendants. Parilla v. IAP

13   Worldwide Serve. VI, Inc., 368 F.3d 269, 275 (3d Cir. 2004); Gospel Missions of

14   America v. City of Los Angeles, 328 F.3d 548, 557(9th Cir. 2003).

15        As a matter of law, defendants are estopped from arguing the Joint Ownership

16   Agreement was never effective and Neuman holds no interest in the beverages and

17   associated intellectual property.  At best, the juxtaposition of defendants prior testimony

18   and statements that the Joint Ownership Agreement effectuated a transfer of the property

19   to the joint ownership of Neuman **and** defendants present argument that the Joint

20   Ownership Agreement was never effective to transfer the property to Neuman illustrates

21   that issues of fact remain to be tried.

22        Defendants will most assuredly cite the February 8, 2008 order denying plaintiffs'

23   application for temporary restraining [Defendants' Ex. SS] in reply and argue the Court's

24   decision in the Valdez Action only denied rescission and did not "definitively" resolve

25   the issue of "Neuman's right to control the production, distribution, marketing, and/or

26   selling of the malternative beverages." But, the contradictory evidence cited above raise

27   numerous triable issues of fact bearing upon that still-unresolved issue of Neuman's

28   rights under the Joint Ownership Agreement. Plaintiffs do not now claim the decision

15

1    in the Valdez Action definitively resolved Neuman's rights under the agreement, but

2    merely that the evidence raises triable issue of fact bearing upon the definitive resolution

3    of those rights in the case.

4    Defendants argue that application of the Delaware General Corporations Law is

5    a matter of law; i.e., that Valdez could not, as a matter of law, transfer corporate assets

6    without board approval. But, that argument, even if accepted solely for the purposes of

7    argument, is premised on a factual predicate - that the Joint Ownership Agreement

8    involved corporate assets. Valdez could clearly transfer his own assets to Neuman

9    without board approval or Kerr's consent.[5] Thus, Valdez's and the moving defendants'

10   prior testimony and statements that the Joint Ownership Agreement did in fact transfer

11   the beverages and intellectual property to the joint ownership of Neuman and Valdez

12   raises triable issues about the underlying factual predicate for defendants "matter of law"

13   moving argument - whether the Joint Ownership Agreement involved corporate assets

14   or, instead, involved beverages and intellectual property owned by Valdez.

15   B.    Valdez's rescission claims in the Valdez Action are inconsistent with

16        defendants present position.

17   In the Valdez Action, Valdez sought to rescind the Neuman/Valdez agreements,

18   including the Joint Ownership Agreement, for fraud, negligent misrepresentation,

19   material failure of consideration, abandonment and mistake. [Defendants' Ex. RR]. In

20   his pleadings, Valdez specifically alleged the execution and existence of the Joint

21   Ownership Agreement and that it provides for "joint ownership by Valdez and Neuman"

22   of the beverages and the associated intellectual property. Valdez did not claim in the

23   Valdez Action, <u>as he and other defendants do now</u>, that the Joint Ownership Agreement

24   was never effective. Rather, Valdez alleged the execution and existence of the agreement

25

26   [5]In fact, in testimony offered by defendants, Neuman testified that  Valdez told him before the agreement that
     he (Valdez) individually owned the beverages and the associated intellectual property. [    ]. This single piece of
27   testimony raises a triable issue. If Neuman is believed in this testimony, it presents a powerful counter to defendants
     argument that B2 Brands acquired the property by "oral agreement" or by "implication" through Valdez's conduct.

28

16

1 and the asserted grounds to rescind it. Further, Valdez proceeded to trial in the Valdez

2 Action on his rescission claims **only**. [Defendants' Ex. RR, Memorandum of Decision

3 in the Valdez Action]. Defendants cannot claim rescission was merely one of several

4 remedies sought and there was some other reason for the Valdez action. Valdez sought

5 <u>only</u> to rescind the agreements. These facts point out the stark contradiction between the

6 Valdez Action and defendants' present position. Defendants <u>now</u> claim the Joint

7 Ownership Agreement was <u>never</u> effective, <u>never</u> enforceable and at all times "<u>void</u>".

8 Yet, Valdez previously alleged the execution and existence of that very same agreement

9 and sought to rescind it. Why seek to rescind an agreement which was ineffective,

10 unenforceable and void at it's very inception, as defendants now claim?

11     The contradictory testimony of Valdez in the two actions noted above is just the

12 evidentiary manifestation of this same contradiction. In the Valdez Action, Valdez

13 needed to establish his compliance with the various agreements to justify rescission. [Ex.

14 27]. So, as noted above, he <u>then</u> testified and repeatedly stated in pleadings that under,

15 and effective the day of, the Joint Ownership Agreement, the beverages and associated

16 intellectual property were transferred to Neuman's joint ownership -

17        **<u>Valdez - December 28, 2009 trial testimony in the Valdez Action</u>**

18              **"I did" transfer the property under the agreement.**

19 But, now that the Joint Ownership Agreement was not rescinded by this Court, Valdez

20 and the other defendants must state the agreement was ineffective, unenforceable and

21 void at its inception and never transferred the beverages and  associated intellectual

22 property to the joint ownership of Neuman -

23        **<u>Valdez - December 21, 2009 deposition testimony in this case</u>**

24              **"No, I did not" transfer the property under the agreement.**

25 The arguments have shifted and so have the facts. The very existence of the rescission

26 claims in the Valdez Action raises triable issues about whether defendants' present

27 position was contrived and fabricated.

28     The moving defendants may argue they are not restricted by the decision against

17

Valdez in the Valdez Action. But, defendants made clear their direct alignment with in their September 7, 2007 motion to dismiss:

> It is also clear that the parties are substantially similar and represented the same interests in both actions. . . . . . . . Valdez, B2 Brands and JP Beverages also represent substantially the same interests in the two actions. Valdez is the founder of B2 Brands. JP Beverages is the current majority owner of B2 Brands. . . . . . The interests of those parties are clearly aligned . . . .

Further, defendant B2 Brands paid all of Valdez's fees and costs in the Valdez Action. Valdez and the moving defendants were concurrently represented by the same attorneys, HamptonHolley LLP. [Ex.9,30:16-20, 73:2-80:24]. Further, the Valdez Action was prosecuted largely for their direct benefit. Valdez has very little ownership interest in B2 Brands and none is JP Beverages. B2 Brands and JP Beverages are producing the product. If Valdez had secured rescission of the Joint Ownership Agreement, defendants would have a powerful defense to this action. Finally, the moving defendants have proffered and are dependent upon Valdez's testimony in support of their motion. To the extent his prior claims, testimony, statements and pleadings in the Valdez Action contradict his present testimony on matters relevant to the motion, triable issues are raised.

      C.     Valdez's execution of the Joint Ownership Agreement establishes that B2 Brands held no rights to the malternative beverage intellectual property at the time of the Joint Ownership Agreement.

Defendant's "the agreement was never effective" argument is predicated on the factual assertion that the beverages and associated intellectual property were assets of B2 Brands at the time of the Joint Ownership Agreement. Defendants concede there is no written agreement under which B2 Brands acquired these "assets". Rather, they assert that B2 Brands' ownership of these "assets" derives from an "oral" transfer from Valdez or is "implied" by Valdez's conduct. But, Valdez's execution of the agreement in and of itself provides strong opposing evidence that the Joint Ownership Agreement did not involve the assets of B2 Brands and that Valdez understood as much at the time, no

1  matter what he says now to defend himself and the other defendants in this case. At best,

2  that reasonable inference can be drawn in plaintiffs' favor from facts noted below and

3  the motion must therefore be denied.

4      Valdez intended to be bound by the Joint Ownership Agreement. [Ex. #, Valdez

5  depo. ; Ex. #, Valdez Memorandum in Valdez Action; Ex. #. Valdez trial testimony in

6  Valdez Action].

7      From incorporation in August 2003 through May 2006, and when he signed the

8  Joint Ownership Agreement, Valdez was the President and sole officer of defendant B2

9  Brands. Valdez understood he had been granted broad powers as the President to act on

10 behalf of the corporation. [Ex 4, 179:21-182:13] But, Valdez also understood that those

11 powers were limited in one significant regard. Valdez testified that he understood,

12 commencing in 2003, that he could not transfer the assets of B2 Brands without the

13 approval of the Board of Directors.

14  Q:    Okay, So you understood during the whole period of time, August of 2003
15         up until the first time you met Mr. Previti, that you couldn't transfer any the
           assets of the corporation without getting approval the formal approval of
16         Mr. Valdez and Mr. O'Connell?

     A:    Absolutely.
17
     Q:    And if you did, that was an unauthorized act?
18
     A:    Well, that's  - -
19
     Q:    Correct?
20
     A:    Yeah. And why would I want to hurt my brother?
21
     Q:    And that would be an illegal act?
22
     A:    Yeah, that would be - - be bad.
23
     [Ex. 4., 186:5-187:16]
24
25      Yet, Valdez, then the President and sole officer of B2 Brands, acting with the

26 admitted understanding that he could not transfer away the assets of B2 Brands without

27 the approval of the Board of Directors, (1) executed the Mesa Top Agreement in May

28 2005 agreeing to transfer the beverages and the associated intellectual property to Mesa

19

1   Top and (2) executed the Joint Ownership Agreement in September 2005 transferring

2   the beverages and intellectual property to the joint Ownership of Neuman. Significantly,

3   Valdez did seek the approval of the Board of Directors before executing either

4   agreement. In fact, despite his admitted understanding at the time that he could not

5   transfer away the <u>assets of B2 Brands</u> without the approval of the Board of Directors he

6   testified that he did not believe he needed Board approval to execute either of these

7   these agreements.  [Ex. 5, 318:15-20, 341-2:8].

8       This testimony present strong evidence opposing defendants present argument that

9   the beverages and the associated intellectual property were "assets" of B2 Brands at the

10  time of the Joint Ownership Agreement.

11      -   **If** Valdez, the then-President and sole officer of B2 Brands, absolutely

12          understood that despite his broad granted powers he could not transfer

13          away assets of the corporation without Board approval;

14      -   **If** Valdez executed the Mesa Top Agreement and the Joint Ownership

15          Agreement without B2 Brands' board approval;

16      -   **If**, despite his admitted clear understanding at the time that he could not

17          transfer away the assets of B2 Brands without the approval of the Board of

18          Directors, he did not believe he needed board approval to execute <u>these</u>

19          agreements;

20      -   **If** Valdez believed that transferring corporate assets without approval of the

21          Board of Directors was an illegal act, "bad" and "would hurt my brother",

22          and,

23      -   **If** he intended to bound by the Mesa Top Agreement and the Joint

24          Ownership Agreement when he signed them,

25  the **<u>only</u>** conclusion to be drawn is that the Mesa Top Agreement and the Joint

26  Ownership Agreement simply did not concern the assets of B2 Brands and Valdez

27  understood as much at the time he executed them. There is simply no other reasonable

28  way to reconcile this undisputed testimony. In fact, in some rather candid testimony in

20

1    the Valdez Action, Valdez confirmed that the Mesa Top Agreement required him to

2    transfer **his** intellectual property. Testifying about the Mesa Top Agreement, Valdez

3    stated that he understood paragraph 9 of that agreement to mean:**"That I should**

4    **transfer over all of <u>my IP</u> to Mesa Top by agreement."** [Ex.1,Valdez Dep, 24:6-

5    25:Ex. 5, Valdez Dep 325:1-330:13]. This undisputed evidence strongly suggests that

6    Valdez understood when executed the Mesa Top Agreement and the Joint Ownership

7    Agreement that the beverages and associated intellectual property were **"<u>my IP</u>"** to

8    transfer. In fact, this single **"<u>my IP</u>"** admission alone raises triable issues about whether

9    Valdez, and not B2 Brands, owned the beverages and intellectual property at the time of

10   the Mesa Top Agreement and the subsequent Joint Ownership Agreement.

11       It is significant the moving defendants do not claim Valdez made a mistake when

12   he executed the Joint Ownership Agreement. In fact, Valdez claimed mistake as a basis

13   for rescission in the Valdez Action and was denied rescission. Further, the moving

14   defendants do not claim Valdez committed fraud upon Neuman by transferring corporate

15   assets that he absolutely knew did not have the authority to transfer. In fact, Jamie

16   Banfield, B2 Brand's general counsel and a defendant in the action does not believe there

17   was fraud. [E. 9, 148:4-19, 173:22-175:22] but could not explain the inconsistency noted

18   above. Further, if Valdez intended to be bound by the agreement, as he has repeatedly

19   stated, he arguably lacked fraudulent intent. Valdez cannot claim that he <u>later</u> learned -

20   i.e., sometime after he lost the Valdez Action - that an asset transfer required board

21   approval. He testified that he knew from August 2003 on that he "absolutely" needed

22   board approval to transfer B2 Brands' assets. [Ex. 4, 186:6-187:16]. There is simply no

23   rational explanation but that Valdez was transferring his own assets under the agreement

24   and knew it.

25       This conclusion is corroborated by other evidence. When Valdez pledged his

26   shares to Kerr in 2004, he did not seek board approval because they were his shares, an

27   action consistent with the conclusion drawn above. [Ex 4, 187:17-188:8] Valdez told

28   Neuman at the time that he (Valdez) owned the property [Neuman Dec. Paras. 4, 9].

Further, Valdez has repeatedly testified that under the Joint Ownership Agreement he and Neuman jointly owned the beverages and intellectual property. If he knew that a transfer of corporate assets required board approval and he purposefully did not seek such approval, he could only declare the effectiveness of the agreement if it transferred his assets, and not corporate assets. Further, this the conclusion the agreement involved only Valdez's assets and effectively transferred those assets explains Ashby's directive to Valdez in December 2005 to rescind the agreements with Neuman before he would invest. If the Joint Ownership Agreement was void transfer of corporate assets, why did Ashby require rescission? Finally, the conclusion the agreement involved only Valdez's assets and effectively transferred those assets explains why Valdez sought rescission in the Valdez Action and why defendants paid for that effort to rescind the agreement. The agreement was effective and had to be rescinded. Even to the extent Valdez now provides contradictory testimony, triable issues remain as to whether the beverages and associated intellectual property were "assets" of B2 Brands or, instead, were the property of Valdez at the time of the Joint Ownership Agreement.

> D.      Defendants' confused and contradictory positions on B2 Brand's alleged ownership of the beverages and the associated intellectual property raise triable issues.

Defendants allege that **"In or about August of 2003, Steven Troy Valdez ("Valdez") incorporated B2 Brands, Inc. under and pursuant to Delaware General Corporations Law and assigned all rights including all intellectual property of any kind to . . . . B2 Brands."** [Defendants Answer to Third Amended Complaint, Paras. 14, 17, 24, 59, 65; Defendants Counterclaim, Para. 8]. But, the defendants offered conflicting testimony as to B2 Brands's alleged acquisition of these "assets".

**Defendant JP Beverages:** Defendant JP Beverages, through its "person most knowledgeable" Christina Previti, was deposed on September 17, 2009. Defendant JP Beverages testified that it, and not B2 Brands, acquired all of the subject intellectual property, including the recipes and formulas for the beverages, from Valdez under a

1   May 20, 2006 "Assignment and Release Agreement". [Ex. 7, Ex. 8, 7:5-25, 22:18-24:21,
2   57:19-58:14, 62:14-63&, 78:4-9] The subject agreement contains no mention of
3   intellectual property or property rights, and the deponent could not clearly articulate
4   exactly how the subject agreement effectuated that transfer.[Ex. ; JP Beverages Depo
5   Testimony; 62:25-63:11].This testimony raises significant triable issues about ownership
6   of the beverages and the associated intellectual property as late as May 2006. In their
7   pleadings and their motion, defendants assert that B2 Brands acquired **all rights** to the
8   beverages and the intellectual property from Valdez in August 2003. Yet, defendant JP
9   Beverages testified that it, and not B2 Brands, acquired all of those intellectual property
10   rights, including the recipes and formulas for the beverages, from Valdez in May 2006.
11   The reasonable inference to be drawn from these facts is that Valdez and JP Beverages
12   believed in May 2006 that the Neuman/Valdez agreements were rescinded and that
13   Valdez held the beverages and the associated intellectual property to transfer to JP
14   Beverages. This testimony raises triable issues about B2 Brands' claimed ownership of
15   the property at the time of Joint Ownership Agreement.   Defendant B2 Brands:
16   Defendant B2 Brands, through its "person most knowledgeable" Jamie Banfield, was
17   deposed on December 8, 2009. Again defendants allege Valdez transferred the beverages
18   to B2 Brands upon its incorporation in August 2003. Yet, B2 Brands actually testified
19   that no such transfer ever occurred because the beverages and associated intellectual
20   property were all developed <u>after</u> B2 Brands' incorporation [Ex. 9, 106:15-109:3, Ex. 12,
21   Ex. 13, 12:13-20:7].

22       But, there was significant activity in development of the product long before B2
23   Brands' incorporation. [Ex 12, 21:18-51:24, Ex. 14, 94:5-96:21] In fact, evidence
24   indicates that development of the beverages begun in early 2003 and was largely
25   completed by the time of B2 Brands' incorporation. [Ex. 5, 271:19-306:13; Ex. 140:16-
26   146:15, 154:15-22]. Valdez testified that B2 Brands' testimony on this point was wrong.
27   [Ex. 5,303:23-310:9] This testimony directly conflicts with defendants position that the
28   rights were transferred by oral agreement or implication upon incorporation of B2

1    Brands and raises triable issues about about B2 Brands' claimed ownership of the
2    property.

3        Defendant Valdez: No declaration from Valdez addressing the issue of B2 Brands
4    claimed acquisition of the beverages and associated intellectual property issue is offered
5    in support of the motion. Instead, defendants offer small snippets of Valdez's deposition
6    testimony given on December 2 , 2009. [Memo, Page 5, lines 23-24]. The offered and
7    rather limited testimony is jumbled and sometimes incoherent. Plaintiff claims to have
8    the "right to use" or a "license" for the beverages and associated intellectual property.
9    Valdez offers no testimony articulating the basis, terms or conditions for the alleged
10   transfer of any such license or right to use the property. At one point, Valdez non-
11   sensically testifies "they had the Ownership, but they have all the rights". He does not
12   explain this statement or identify who "they" is. [Ex. LL. 265:15-16]. At another point,
13   he says "by implication and by my conduct, they had all the rights". Again, he doesn't
14   articulate what the "implication" or "conduct" was, when they "had" the rights or if they
15   still do, or who "they" are. [Ex. LL. 266:12-20]. At another point, he testifies that "I
16   didn't think there had to be an agreement or contract between what I'm working on and
17   B2 Brands, Inc," and "I don't don't know where there had to be a  - - agreement, other
18   than they had my permission to use all of this because I was developing it all for B2
19   Brands, Inc., and for the benefit  of B2 Brand, Inc." Again, he doesn't articulate who
20   "they" was and when they "had permission to use all of this". But, this testimony seem
21   to undercut defendants allegations of an oral agreement to transfer the beverages and
22   intellectual property to B2 Brands, Inc. At another point, Valdez testifies "No, it was
23   always my intent to - - to get permission to license, however you want to call it, transfer
24   to B2 Brands, Inc., a Delaware Corp., doing business as B2 Beverages . . .". But, again,
25   Valdez does not explain this non-sensical statement nor whether, when or if he followed
26   through on his intention. Further, a state of California in early 2007 stated that B2
27   Brands, Inc. did not commence to do business as B2 Beverages until late 2006. [Ex. 4,
28   161:7-166:12].

24

A common thread in the limited Valdez testimony offered and in the motion he everything for B2 Brands, Inc. Even this assertion raises issues. Most all of the product development was completed before B2 Brands came into existence on August 15, 2003. There is little evidence of significant product after Fall 2003. In fact, Valdez testified in the Valdez Action that with respect to the product, "Everything was done" by the fall of 2003 pushing through the trademarks and getting investment money. [[Ex. 5, 271:19-306:13; Ex. 140:16-146:15, 154:15-22].

The offered Valdez testimony does not dispense with all triable issues concerning B2 Brands' claimed acquisition and ownership of the "assets".

E.    Defendants disingenuous use of the Memorandum of Decision in the Valdez Action.

Defendants repeatedly refer to a single sentences in the memorandum of decision in the Valdez Action as proof that "Valdez operated the malternative beverage business through B2 Brands beginning in 2003" But, the referenced sentence simply does not say that. The Court, in January 2008, stated that Valdez "conducts his business ventures through a corporate entity known as B2 Brands, Inc." That statement is not retrospective - it says Valdez "conducts" his business ventures. The relevant time period for analysis here is August 2003 - the date of B2 Brands' formation - though September 2005 - the date of the Joint Ownership Agreement. The court's finding does not say by any stretch of the imagination that Valdez conducted his business ventures through B2 Brands during that period. In fact, in the very next sentence, the court says that in or around 2003, **Mr. Valdez**, not B2 Brands or Valdez on behalf of B2 Brands, started developing the products. That can be read as a finding supportive of plaintiffs position that Valdez developed and owned the assets. Further, a literal reading of this finding raises some new issues. The conducting of one's own business ventures "through a corporate entity" raise the spectre "alter ego" liability. If Valdez was running his business ventures "through" B2 Brands, perhaps B2 Brands should simply be deemed his alter ego. Clearly, the court made no such ruling. The comment is offered illustrative purposes only. But, the Court

1   also did not rule that "Valdez operated the malternative beverage business  through B2

2   Brands beginning in 2003". The referenced ruling simply does not say that and neither

3   the parties nor this court should attempt to glean a larger meaning from this single

4   statement.

5       F.    The motion is largely supported by inadmissible evidence

6       Defendants offer various documents in support of their motion but no testimony

7   establishing the authenticity or relevance of such evidence. Defendants offer no

8   substantive affidavits supporting the motion. They offer only the declaration of Jee

9   Young You, a lawyer at defendants' counsels' firm who purports to authenticate all the

10  documents offered in support of the motion. Yet, She has absolutely no personal

11  knowledge of, and cannot, as a matter of law, authenticate the vast majority of those  An

12  attorney, like any other witness, can only provide testimony on matters of which She has

13  personal knowledge. A motion for summary judgment can only be supported by

14  affidavits made upon personal knowledge. FRCP 56(e)(1).  The rule is not different for

15  an attorney. Attorney Young You purports to authenticate emails, agreements,

16  correspondence and other documents from years ago addressing matters and facts of

17  which She could have no personal knowledge. Clearly, attorney can authenticate matters

18  in litigation in which She has personal knowledge of, such as the pleadings in the case,

19  the receipt and authenticity of transcripts, or even the testimony given in the case if

20  personally witnessed. But, Attorney Young You cannot authenticate  all documentary

21  evidence in the case "by virtue of my representation of the B2 Defendants in this matter,

22  ". Plaintiff have filed objections to and motions to strike most of documentary evidence

23  offered in support of the motion. Those motions should granted.

24      G.    Triable issues remain as to whether B2 Brands owned or held any rights to

25              the malternative beverage intellectual property at the time of the Joint

26              Ownership Agreement.

27      Defendants allege that concurrent with the incorporation of B2 Brands, Inc,

28  Valdez **assigned all rights to all intellectual property of any kind to B2 Brands."**

26

1    Admissions in the opposing party's pleadings, even if unverified, are admissible and may

2    serve as a basis for opposing summary judgment. <u>Lockwood v. Wolf Corp.</u> (9th Cir.) 629,

3    F.2d 603; FRE 80(d)(20). This admission <u>alone</u> raises a triable issues because defendants

4    are **<u>now</u>** arguing that in August 2003 B2 Brands <u>only</u> received a "license" or "right to

5    use" the subject intellectual property from Valdez for an undisclosed time period and

6    upon undisclosed terms and conditions. [Memo, Pages 13, 29]. This significant change

7    of position was likely prompted by the recognition that numerous triable issue of fact

8    remain as to alleged August 2003 "assignment" of "all rights" including "all intellectual

9    property of any kind relating to B2 Brands". Nevertheless, this substantial new conflict

10   between what defendants have repeatedly alleged <u>and</u> what they <u>now</u> assert raises triable

11   issues about exactly what B2 Brands may, or may not, have held as an asset and upon

12   what terms and conditions at the time of the Joint Ownership Agreement. For example,

13   if B2 Brands only held a license to use the property commencing in 2003, what were the

14   terms of that license? Was it subject to revocation? There is no evidence before the Court

15   on these issues. If such a license was granted, did Valdez intend to revoke that license

16   when he entered into the Joint Ownership Agreement? That would be consistent with his

17   repeated pronouncements that he and Neuman owned all the beverages and associated

18   intellectual property under the agreement. After the rescission claims were rejected in

19   the Valdez Action and the Joint Ownership Agreement was re-affirmed, counsel for

20   Neuman demanded in writing that B2 Brands cease and desist further production. This

21   fact alone raises triable issues as to whether Neuman's post-Valdez Action demands

22   acted to revoke any such license.

23        Further, that lack of any mention of the beverages and associated intellectual

24   property in the corporation formation documents raises triable issues. It is undisputed

25   there was no documented transfer of the beverages and the associated intellectual

26   property as a part of the formation of B2 Brands. The Bylaws and corporate resolutions

27   made upon formation of B2 Brands in August 2003 make no mention of the beverages

28   and/or the associated intellectual property, much less document any transfer of that

property, or any property, to the corporation.

The now-alleged acquisition by B2 Brands from Valdez of "all rights" upon the formation of B2 Brands juxtaposed against the contemporaneous absence of any mention of the beverages and/or associated intellectual property in August 2003 formation documents for B2 Brands raises triable issues about the now-alleged transfer. If Valdez actually intended to transfer these assets to B2 Brands upon its formation, as he now claims, why wasn't that accomplished in the formation documents or in some concurrent writing? Valdez was already an experienced businessman at the time and was represented by counsel in the formation. [Ex 2, 131:21-139:16]. A reasonable inference can be drawn from this evidence is that Valdez did not transfer the beverages and intellectual property rights to B2 Brands as defendants now allege.

The motion must also fail due to the significant lack of evidence supporting key assertions. Defendants argue Joint Ownership Agreement was subject to approval by Kerr. In support of that defendants claim that Valdez repeatedly warned Neuman that "the alleged transfer of B2 Brands assets under the Joint Ownership Agreement could not be effectuated legally unless and until" Kerr was given notice and provided consent and that absent Kerr's consent "it was impossible to obtain the assets". [Memo, Page 3, 10] The evidence cited at page 10, lines 19-22 of defendants memorandum simply does not prove this assertion. For example, defendants cite to Ex DD as evidence that Valdez warned Neuman that it was "impossible" to obtain the assets absent notice to and consent from Kerr. Exhibit DD is the January 14, 2006 letter from Valdez to Neuman, six months after the Mesa Top Agreement and four months after the Joint Ownership Agreement. The letter does not even mention the Joint Ownership Agreement and does not say that it "impossible" to obtain the assets absent consent from Kerr. In fact, the letter confirms the Mesa Top Agreement, alleges breach by Neuman and states that in light of outstanding debts, **it is "impossible and impractical for Company to engage in any business activities"**.The other cited evidence also does not support the stated proposition. Apparently, defendants hope the Court will not actually review the

28

1  evidence. Further Neuman flatly denies Valdez ever told him the Joint Ownership
2  Agreement was contingent upon consent from B2 and/or Kerr.[Neuman Dec., Paras. 4,
3  5, 9, 10].

4       Defendants argue that a corporation gains an interest in intellectual property where
5  an individual uses the resources of the company, citing the Shops Right Doctrine.
6  [Memo, page 23]. Defendants offer no evidence that Valdez did anything other than use
7  and sign the name of B2 Brands on documents during the relevant period of August 2003
8  to September 2005. Defendants offer no evidence that B2 had any resources much less
9  used them to develop the product between August 2003 and September 2005.  Triable
10  issue remain to be tried.

11  VI.

12  TRIABLE ISSUES REMAIN AS TO WHETHER EITHER NEUMAN OR
13  VALDEZ COULD USE OR TRANSFER THE MALTERNATIVE BEVERAGE
14  INTELLECTUAL PROPERTY WITHOUT THE OTHER CONSENT UNDER THE
15  JOINT OWNERSHIP AGREEMENT.

16       Defendants argue that absent an agreement imposing restrictions on the use of
17  intellectual property, joint owners may use the jointly owned intellectual property
18  independently of each other and wihout each other knowledge's, permission or assent.
19  Just such a restriction existed with the Joint Ownership Agreement. Both Neuman and
20  Valdez understood and agreed that under the Joint Ownership Agreement, neither party
21  could use of transfer away the beverages and associated intellectual property without the
22  consent of the other. Defendants point to Neuman's alleged use of the property after
23  December 2006, But the undisputed fact is that Neuman did not proceed to produce the
24  beverage or transfer the intellectual property. [Neuman, Dec. Para 19, Ex 13, 130:2-
25  132:21] At best. Triable issues remain as to whether Neuman and Valdez understood
26  there were restrictions on use and transfer under the Joint Ownership Agreement.

27
28

29

1

2                                    VIII.

3                               CONCLUSION

4        Plaintiffs respectfully request that the motion be denied.

5

6

7    Date: January 22, 2009                /s/ James D. Crosby

8                                          Attorney for Plaintiffs  PHILIP NEUMAN and
                                           HILO AT CAMPBELL HALL ASSOCIATES,
9                                          LLC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          30